COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | |
|---|---|
| **MONTGOMERY LINCOLN, INC. d/b/a LINCOLN OF CINCINNATI**<br>9620 Montgomery Road<br>Cincinnati, Ohio 45242<br><br>and<br><br>**NORTHGATE LINCOLN-MERCURY, INC. d/b/a NORTHGATE FORD**<br>8940 Colerain Avenue<br>Cincinnati, Ohio 45251<br><br>and<br><br>**CINCYAUTOS, INC. d/b/a LEBANON FORD and INTERSTATE FORD**<br>770 Columbus Avenue<br>Lebanon, Ohio 45036<br>and<br>125 South Alexandersville Road<br>Miamisburg, Ohio 45342<br><br>Plaintiffs,<br><br>v.<br><br>**FORD MOTOR COMPANY**<br>One American Road<br>Dearborn, Michigan 48126<br><br>Defendant.<br><br>SERVE ALSO:<br><br>CT CORPORATION SYSTEM<br>STATUTORY AGENT<br>4400 Easton Commons Way, Suite 125<br>Columbus, OH 43219 | Case No. _____<br><br>(Judge _____)<br><br><br><br><br><br><br><br>**COMPLAINT** |

For their Complaint against defendant Ford Motor Company ("Ford"), Plaintiffs

Montgomery Lincoln, Inc. d/b/a Lincoln of Cincinnati ("Montgomery Lincoln"), Northgate

Lincoln-Mercury, Inc. d/b/a Northgate Ford ("Northgate Ford"), and Cincyautos, Inc. d/b/a Lebanon Ford and Interstate Ford (the plaintiffs will also be collectively referred to herein as "Plaintiffs"), state as follows:

### Preliminary Statement

1. Plaintiffs are bringing this action pursuant to Ohio Revised Code ("ORC") Chapter 4517, which is Ohio's Motor Vehicle Dealers' Franchise Act ("the Dealer Act"). As set forth herein, Ford is violating numerous sections of the Dealer Act.

2. Ford recently announced that it was radically changing the franchises of all of its Ford and Lincoln dealers, including Plaintiffs' franchises.

3. Currently, Plaintiffs are selling Ford vehicles, whether powered by internal combustion engines ("ICE"), hybrid gasoline-electric vehicles, or electric vehicles ("EVs"), all side-by-side and under existing franchises with Ford. In fact, in late 2021 and early 2022, Ford certified various of its dealers, including Plaintiffs, for EV sales by requiring dealers to purchase chargers and other equipment pursuant to the Next Generation EV Certification Program ("the Next Gen Program"). Plaintiffs purchased and installed the required chargers and equipment and are therefore currently Ford-Certified EV dealers.

4. However, in September, 2022, Ford formally announced that, if a dealer wants to continue to sell EV Ford and Lincoln vehicles, even if those dealers are currently Certified EV dealers under the Next Gen Program, like Plaintiffs, they must become "Model e" certified ("the Ford EV Program") and "Lincoln EV Certification 2.0" certified ("the Lincoln EV Program," collectively "the EV Programs"). In order to participate in the Ford EV Programs, Ford dealers, including plaintiffs Northgate Ford, Lebanon Ford, and

2

Interstate Ford, will be required to invest over $1.2 million per dealership in Ford-mandated equipment and upgrades by January 1, 2024.

5. Far from imposing lawful requirements to maintain adequate parts, tools, and training to service EVs (permitted by the Dealer Act), the EV Programs contain provisions constituting unlawful franchise modifications, unfair pricing requirements, margin reductions, and unlawful allocation systems, which are all expressly prohibited by the Dealer Act.

6. Ford has attempted to characterize the EV Programs as "voluntary". However, if a dealer refuses to participate in the EV Programs, it will lose the ability to sell and service EVs – the future of the automobile industry – and will soon find itself unprofitable and eventually out of business. Thus, participation in the EV Programs is in no way voluntary.

7. Accordingly, Plaintiffs are bringing this action to seek declaratory and injunctive relief to prevent Ford from implementing these unlawful requirements, to order Ford to permit Plaintiffs to continue to sell and service Ford and Lincoln EVs and hybrids to their customers regardless of whether they participate in the EV Programs, and to award Plaintiffs monetary damages, attorney fees, and costs.

## The Parties

8. Plaintiff Montgomery Lincoln is an Ohio corporation doing business at 9620 Montgomery Road, Cincinnati, Ohio 45242. Montgomery Lincoln is an authorized dealer of Lincoln automobiles and is a "franchisee" of defendant Ford, as defined in ORC Chapter 4517.

E-FILED 02/01/2023 2:39 PM / CONFIRMATION 1280166 / A 2300445 / COMMON PLEAS DIVISION / IFI

9. Plaintiff Northgate Ford is an Ohio corporation doing business at 8940 Colerain Avenue, Cincinnati, Ohio 45251. Northgate Ford is an authorized dealer of Ford automobiles and is a "franchisee" of defendant Ford, as defined in ORC Chapter 4517.

10. Plaintiff Lebanon Ford is an Ohio corporation doing business at 770 Columbus Avenue, Lebanon, Ohio 45036. Lebanon Ford is an authorized dealer of Ford automobiles and is a "franchisee" of defendant Ford, as defined in ORC Chapter 4517.

11. Plaintiff Interstate Ford is an Ohio corporation doing business at 125 South Alexandersville Road, Miamisburg, Ohio 45342. Interstate Ford is an authorized dealer of Ford automobiles and is a "franchisee" of defendant Ford, as defined in ORC Chapter 4517.

12. Defendant Ford is a Delaware corporation with its headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford is a "franchisor" as that term is defined in ORC Chapter 4517.

13. Ford manufactures and distributes Ford and Lincoln brand vehicles through its network of franchised dealers throughout the United States, including Plaintiffs.

**Jurisdiction and Venue**

14. This Court has personal jurisdiction over Ford due to Ford's continuous contacts with the State of Ohio and because this action arises from Ford's conduct in the State of Ohio.

15. Venue is proper in this Court under Rule 3(C) of the Ohio Rules of Civil Procedure because: a substantial part of the events giving rise to the claims occurred in Hamilton County, Ohio; Ford is conducting activities in Hamilton County giving rise to

4

Plaintiffs' claims; and because Plaintiffs Northgate Ford and Montgomery Lincoln are located in Hamilton County.

### Relevant Facts

**A)** **The Status Quo**.

16. Plaintiffs are currently all successful Ford and Lincoln dealers. All of the Plaintiffs have entered into dealer agreements with Ford ("the Dealer Agreements"), which permit Plaintiffs to sell all respective Ford and Lincoln cars and trucks, regardless of the means of propulsion. The Dealer Agreements further govern the business conduct of the parties toward each other as a matter of fact and as required by the Dealer Act.

17. Ford has been selling vehicles using alternative power trains such as hybrids and EVs for almost 20 years; and it has sold these vehicles through its existing dealer networks through existing dealer agreements, including the Plaintiffs' Dealer Agreements.

18. Ford currently sells two EVs, the Ford Mustang Mach e and the F150 Lightning, through its existing dealer network under existing franchise agreements.

19. Ford and Lincoln ICE vehicles, hybrid vehicles, and EVs are all defined as "COMPANY PRODUCTS" under Plaintiffs' existing Dealer Agreements[1]. In other words, Ford currently makes no distinction between these types of vehicles in its existing Dealer Agreements, including its Dealer Agreements with Plaintiffs.

20. Plaintiffs Northgate Ford, Interstate Ford, and Lebanon Ford sell and service Ford's current lineup of EVs under their respective Dealer Agreements.

---

[1] The various Dealer Agreements between Plaintiffs and Ford are not attached to this Complaint as they are quite lengthy and because Ford already has copies of these agreements.

21. While Lincoln doesn't currently offer an EV for sale, it does offer for sale "plug in hybrid" vehicles, which are propelled using a combination of electric motors and gasoline powered engines.

22. Plaintiff Montgomery Lincoln currently sells and services Lincoln hybrid vehicles under its existing Dealer Agreement.

23. Ford and Lincoln dealers such as Plaintiffs have demonstrated that they can sell EV and hybrid vehicles effectively and Ford's EV and hybrid sales have risen significantly over the last few years.

24. As noted above, Ford dealers like Plaintiffs are selling EVs at a rapid rate rivaling Tesla, which has been in the EV market far longer than Ford.  Ford has fallen short by failing to keep up with demand, and thus has restricted EV sales below demand, solely due to Ford's failure to produce a sufficient number of EV vehicles.

25. Despite the strong performance by its dealers in selling EVs, in September, 2022 Ford informed its dealers that it was fundamentally changing their franchises by requiring dealers to comply with unlawful requirements in order to sell EVs in the future.

26. These new requirements come at a time when the industry is shifting from the majority of automobiles using ICE powertrains to EVs.

27. For dealers like Plaintiffs, the ability to sell and service new EVs will be critical to survival.

28. As set forth below, through the EV Programs, Ford seeks to coerce dealers into spending millions of dollars unnecessarily to sell vehicles they are already authorized to sell under their Dealer Agreements, and to agree to limitations and unlawful requirements they currently do not face.

6

### B) The Ford EV Program

29. In order to continue to sell and service Ford EVs, a Ford dealer must either be a Ford "Model e Certified" dealer or a "Model e Certified Elite" dealer. Dealers who do not participate in some form in the Ford EV Program cannot order, sell, or service Ford EVs as of January 1, 2024. Thus, there is nothing voluntary about participating in the Ford EV Program.

30. Ford will not allow Model e Certified dealers to keep inventory of EVs at the dealership, nor will Ford permit Model e Certified dealers to keep any vehicles on hand for customers to test drive as demonstrators.

31. Ford will also restrict sales by Model e Certified dealers to "Build to Order," with a cap of up to 25 retail orders annually.

32. Model e Certified Elite dealers will be allowed to sell EVs with no restriction on volume, but from a limited number of ground stock available for sale.

33. Additionally, Model e Certified dealers are required to install at least one Level 3 charger, which must be available for the public to use 24 hours a day, 7 days a week, 365 days a year.

34. Model e Certified Elite dealers are required to install two Level 3 chargers by 2024 with a third by 2026.

35. Ford projects the total cost for hardware and installation for each Level 3 charger to be $300,000.00.

36. Ford estimates that the costs to purchase and install the requisite chargers will run between $770,000-$1,120,000 for a Model e Certified Elite dealer, and approximately $450,000 for a Model e Certified dealer.

37. There are additional costs and requirements for a dealer to sell EVs as set forth below and in Ford's "Model e Dealer Playbook" – which sets forth the relevant terms of Ford's EV Program:

| Requirement | Cost |
|---|---|
| Annual Training | $40,000/Certified Elite Model e<br><br>$25,000/Certified Model e |
| Retail Environment | $25,000-$50,000/Certified Model e |
| Technology Tools | $6,000+ $800/EV specialist |
| Displays | $5,000 |

38. By the above actions, Ford is apparently shifting the burden of building out a nationwide EV charging infrastructure (what Ford refers to as the "Blue Oval Charging Network") to its dealers to maximize its own margins and profits.

39. Indeed, Ford is requiring its dealers to install expensive Level 3 chargers and make them available to the public 24 hours per day, 7 days per week, 365 days per year.

40. The cost to install the chargers does not include electric bills and ongoing maintenance and security that dealers will be required to provide so they can have chargers available to the public 24 hours a day, 7 days a week, 365 days a year.

41. The charger requirements Ford imposes in the EV Programs go well beyond what is needed to charge the limited number of demonstrators and service vehicles at a dealership at any one time.

42. Moreover, Ford and Lincoln dealers are already successfully competing in the EV and hybrid space without the need of incurring millions of dollars in unnecessary costs and the loss of autonomy of their businesses.

43. Besides requiring dealers to spend significant sums in infrastructure to become Model e Certified or Model e Certified Elite, Ford also sets requirements regarding sales practices a dealer must follow.

44. In this regard, under the EV Programs, dealers, including Plaintiffs, must comply with all of the following requirements from Ford:

- Utilize only Ford's E-Commerce platform for all EV transactions, whether online or in person, and submit a Digital Closing Statement for each sale;

- Use only Ford's "Guest XP Program" for all service appointments;

- Price all EVs according to Ford's Model e Allowable Advertised Price ("MAAP"). Dealers are not permitted to advertise or promote EVs at a price, payment, or offer that is outside of MAAP;

- Provide remote delivery for all EV sales, pick-up and delivery and free loaner vehicles for 100% of service visits (warranty and customer pay), for 3 years/36,000 miles;

- Return all EVs fully charged and washed after every service visit; and

- Honor the value by Ford from its "trade-in tool" for customer trade in allowances.

9

None of these requirements exist under the current Dealer Agreements; nor are they applicable to customers who purchase ICE or hybrid electric Ford vehicles; nor are they required by Ford's current Next Gen Certification to sell EVs.

### C) The Lincoln EV Program

45. In order for a Lincoln Dealer to sell and service Lincoln EVs, the dealer must participate in the Lincoln EV Program by January 1, 2024. If it does not, that dealer cannot order, sell, or service Lincoln EVs.

46. Similar to the Ford EV Program, the Lincoln EV Program represents a significant change to the dealers' existing franchise relationship with Ford. The chart below summarizes the key requirements of the Lincoln EV Program:

| Requirement | Description |
|---|---|
| Non-Negotiable Pricing | Dealer is required to sell vehicle at a set price. |
| Since E-Commerce Program | Dealer is required to use Ford's website for all client transaction, including submitting order to Ford. |
| Demo Units | Dealer is required to stock a minimum number of demo vehicles. |
| Loaner Vehicles | Dealer is required to maintain a fleet of loaner vehicles set by Ford, and must offer pickup and delivery to 100% of its customers. |
| Charging | Dealer is required to maintain a certain number of chargers, regardless of whether the dealer has obtained charges through the Ford EV Program. |
| Service Tech Platform | Dealer must use Guest XP. |
| Remote Experiences | Dealer must offer all of its customers pickup and delivery and offer to deliver all |

|  | new vehicles to customers rather than have them take delivery at the dealership. |
|---|---|
| Service Capacity | Dealer must provide same day service. |
| Digital "Closing Statement" | Dealer must submit a "digital closing statement" on each vehicle sold. |

47. While the Lincoln Retail EV Experience Readiness Guide does not include pricing for these requirements, Ford estimates that some Lincoln dealers will have to spend more than $900,000 to comply with the Lincoln EV Program. Upon information and belief, this amount is four times what competing Cadillac dealers have to spend to sell Cadillac EVs.

48. Like the Ford EV Program, the Lincoln EV Program requires dealers to install costly chargers regardless of demand and make them available at all hours to customers. Similar to its Ford EV Program, Ford is building out a national charging infrastructure on the backs of its dealers such as plaintiff Montgomery Lincoln.

49. None of these requirements under the Lincoln EV Program are in the Lincoln Dealer Agreements.

50. Lincoln dealers must enroll in the Lincoln EV Program and incur all of the above costs by December 31, 2023, or they will lose their rights to sell Lincoln EVs.

51. Furthermore, Ford has tied compliance with the Lincoln EV Program to wholesale price discounts on all Lincoln inventory purchased from Ford. Specifically, compliance with the Lincoln EV Program has been made a foundational element of the Lincoln Commitment Program ("LCP"). This means that any Lincoln dealer that does not sign up for the Lincoln EV Program and meet compliance milestones will lose wholesale price discounts on all their new vehicle inventory equal to 5.5% of MSRP on each vehicle

E-FILED 02/01/2023 2:39 PM / CONFIRMATION 1280166 / A 2300445 / COMMON PLEAS DIVISION / IFI

(the "LCP Price Discounts"). Loss of the LCP Price Discounts will render Lincoln dealers such as plaintiff Montgomery Lincoln unprofitable and could put them out of business.

52. Finally, participation in the Lincoln EV Program will not ensure that Lincoln dealers will receive a sufficient number, or even any, EV vehicles, as Ford has expressly informed its Lincoln dealers that participation in the Lincoln EV Program "does not guarantee allocation for any vehicles, EV or otherwise."

### The Dealer Act

53. According to ORC § 4517.011, the Dealer Act "shall be liberally construed in order to ensure a sound system for distributing and selling motor vehicles" in Ohio.

54. The purpose of the Dealer Act is to "prevent fraud, unfair practices, discrimination, and other abuses"; to maintain "full and fair competition among intra-brand and inter-brand dealers"; and to maintain "strong and sound dealerships in order to provide continuing and necessary reliable services to the citizens of [Ohio]…."

### Causes of Action

### Count One: Violation of ORC § 4517.59(A)(6)(b)

55. Plaintiffs restate Paragraphs 1-54 of their Complaint as if fully rewritten herein.

56. ORC § 4517.59(A)(6)(b) makes it unlawful for a franchisor such as Ford to "[w]ithhold or delay delivery of motor vehicles out of the ordinary course of business" to its franchisees, such as Plaintiffs.

57. Despite the above prohibition, Ford is expressly informing its Ford and Lincoln dealers, including Plaintiffs, that, unless they participate in the EV Programs, they will receive **no** EV vehicles. Such an act would directly violate ORC § 4517.59(A)(6)(b).

E-FILED 02/01/2023 2:39 PM / CONFIRMATION 1280166 / A 2300445 / COMMON PLEAS DIVISION / IFI

58. As a direct and proximate result of Ford's violation of ORC § 4517.59(A)(6)(b), Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count Two: Violation of ORC § 4517.59(A)(6)(c)

59. Plaintiffs restate Paragraphs 1-58 of their Complaint as if fully rewritten herein.

60. ORC § 4517.59(A)(6)(c) makes it unlawful for a franchisor such as Ford to "[d]iscriminate against any franchisee [such as Plaintiffs] in the allocation or through the withholding from delivery of certain models of motor vehicles ordered by a franchisee out of the ordinary course of business."

61. By refusing to provide EV vehicles to Plaintiffs unless they participate in the EV Programs, Ford is violating this statutory provision.

62. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count Three: Violation of ORC § 4517.59(A)(6)(d)

63. Plaintiffs restate Paragraphs 1-62 of their Complaint as if fully rewritten herein.

64. ORC § 4517.59(A)(6)(d) makes it unlawful for a franchisor such as Ford to "[u]nfairly change or amend unilaterally a franchisee's allotment of motor vehicles or quota…."

13

65. Ford has violated ORC § 4517.59(A)(6)(d) by unilaterally changing Plaintiffs' allotment of EV vehicles simply because they will not participate in Ford's EV Programs. Indeed, Plaintiffs are all receiving EV/hybrid vehicles currently without participation in the EV Programs and consistent with Ford's Next Gen Program.

66. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count IV: Violation of ORC § 4517.59(A)(6)(f)

67. Plaintiffs restate Paragraphs 1-66 of their Complaint as if fully rewritten herein.

68. ORC § 4517.59(A)(6)(f) makes it unlawful for any franchisor to "[e]mploy any coercive techniques for any other purposes such as obtaining franchisee participation in…sales devices."

69. By requiring Plaintiffs to participate in the EV Programs with the threat of Plaintiffs not receiving **any** EV vehicles if they do not participate, Ford has violated ORC § 4517.59(A)(6)(f).

70. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count V: Violation of ORC § 4517.59(A)(8)(a)

71. Plaintiffs restate Paragraphs 1-70 of their Complaint as if fully rewritten herein.

72. ORC § 4517.59(A)(8)(a) makes it unlawful for a franchisor to "remodel, renovate, or recondition the new motor vehicle dealer's existing dealership facilities as a prerequisite to receiving the model, part, or product, unless reasonably necessary to accommodate adequate sale and service of a vehicle based on the technology of that vehicle…."

73. As set forth above, all of the Plaintiffs have been successfully selling EV and hybrid vehicles for years without any need to make the cost-prohibitive and expensive renovations required by Ford under its EV Programs. Therefore, Ford is violating ORC § 4517.59(A)(8)(a) by requiring the renovations required by the EV Programs.

74. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count VI: Violation of ORC § 4517.59(A)(8)(b)

75. Plaintiffs restate Paragraphs 1-74 of their Complaint as if fully rewritten herein.

76. ORC § 4517.59(A)(8)(b) makes it unlawful for any franchisor to require "a franchisee to pay an additional fee to receive any…product within a franchisor's line-make."

77. As set forth above, Plaintiffs are currently authorized to sell all of Ford's products, including EVs and hybrid vehicles.

78. By requiring Plaintiffs to pay over $1.2 million dollars per dealership just to be able to continue to sell Ford's EVs and hybrid vehicles, Ford is violating ORC § 4517.59(A)(8)(b).

15

79. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count VII: Violation of ORC 4517.59(A)(15)

80. Plaintiffs restate Paragraphs 1-79 of their Complaint as if fully rewritten herein.

81. ORC § 4517.59(A)(15) prohibits franchisors from engaging "in any predatory practice or discriminat[ing] against any new motor vehicle dealer including discriminating against a franchisee, as compared to a same line-make franchisee, with regard to motor vehicle allocation…, [or] dealership facility requirements…."

82. By withholding EVs from Plaintiffs unless they each spend over $1.2 million in additional facility additions, Ford is violating ORC § 4517.59(A)(15).

83. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count VIII: Violation of ORC § 4517.59(A)(21)

84. Plaintiffs restate Paragraphs 1-83 of their Complaint as if fully rewritten herein.

85. ORC § 4517.59(A)(21) prohibits franchisors from preventing "any new motor vehicle dealer from charging any consumer any fee allowed to be charged by the dealer under Ohio law."

86. By preventing Plaintiffs from offering any EVs for sales at prices other than those allowed by Ford's MAAP Program, Ford is violating ORC § 4517.59(A)(21).

87. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count IX: Violation of ORC § 4517.59(A)(23)

88. Plaintiffs restate Paragraphs 1-87 of their Complaint as if fully rewritten herein.

89. ORC § 4517.59(A)(23) prohibits franchisors from requiring franchisees to "make any substantial alterations to the dealership premises or facilities" if the proposed changes are "unreasonable in light of the current market and economic conditions" **or** if the changes are proposed "without a written estimation of a sufficient supply of new motor vehicles so as to justify" the changes.

90. Ford has violated ORC § 4517.59(A)(23) by requiring Plaintiffs to make the substantial and costly changes set forth in this Complaint without providing Plaintiffs with any estimation that Ford will be supplying Plaintiffs a sufficient number of EVs if Plaintiffs make these changes. Ford is further violating this statutory section by requiring these extensive and expensive changes given the current market and economic conditions.

91. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count X: Violation of ORC § 4517.59(B)(1)

92. Plaintiffs restate Paragraphs 1-91 of their Complaint as if fully rewritten herein.

93. ORC § 4517.59(B)(1) prohibits franchisors from discriminating against that franchisor's dealers with respect to, among other things, internet listings and marketing programs.

94. Ford is violating ORC § 4517.59(B)(1) by discriminating against Plaintiffs, compared to other Ford dealers, by prohibiting Plaintiffs from utilizing Ford's internet platform without participating in Ford's EV Programs.

95. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

### Count XI: Violation of ORC § 4517.59(A)(1)

96. Plaintiffs restate Paragraphs 1-95 of their Complaint as if fully rewritten herein.

97. ORC § 4517.59(A)(1) requires franchisors to act in good faith toward their franchisees.

98. By engaging in all of the acts previously set forth in this Complaint, Ford is failing to act in good faith toward Plaintiffs and is therefore violating ORC § 4517.59(A)(1).

99. As a direct and proximate result of such violation, Plaintiffs are entitled to a declaratory judgment that such conduct is unlawful, injunctive relief to prevent such unlawful conduct from occurring, and monetary damages, including attorney fees.

WHEREFORE, Plaintiffs, jointly and severally, respectfully request that they be granted all of the following relief:

- a declaratory judgment declaring that the Ford and Lincoln EV Programs violate Ohio law;

E-FILED 02/01/2023 2:39 PM / CONFIRMATION 1280166 / A 2300445 / COMMON PLEAS DIVISION / IFI

- a preliminary and permanent injunction prohibiting Ford from implementing the unlawful requirements of the EV Programs and permitting Plaintiffs to continue to be able to sell EVs and hybrid vehicles, regardless of whether they participate in the EV Programs;

- compensatory damages in an amount to be determined at trial;

- attorney fees and the costs of this action; and

- all other relief to which Plaintiffs may be entitled.

Respectfully submitted,

/s/ *Curtis L. Cornett*
Curtis L. Cornett (0062116)
Alison M. Huenefeld (0091253)
Cors & Bassett, LLC
201 East Fifth Street, Suite 900
Cincinnati, OH 45220
(513) 852-8226 – telephone
(513) 852-8222 – facsimile
clc@corsbassett.com
amh@corsbassett.com

*Attorneys for Plaintiffs Montgomery Lincoln, Inc. d/b/a Lincoln of Cincinnati, Northgate Lincoln-Mercury d/b/a Northgate Ford, Cincyautos d/b/a Lebanon Ford and Interstate Ford*